In re PEACHES RECORDS AND TAPES, INC. a California corporation, and Nehi Record Distributing Corporation, Debtor.

Kenneth BRUDER and Roland Bandy, Appellants,

v.

PEACHES RECORDS AND TAPES, INC.; Nehi Record Distributing Corp.; David A. Gill, Trustee of Peaches and Nehi, Bromo of Dallas, Inc., and Sound Warehouse of Dallas, Inc., Appellees.

BAP No. CC–82–1039–VAbP.

Bankruptcy Nos. LA–81–06676–WL, LA–81–06677–WL.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued July 13, 1983.

Decided Feb. 22, 1985.

Robin A. Levitt, Dreyer & Traub, New York City, for appellants.

Richard W. Brunette, Jr., Michael K. Slattery, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for appellees.

Before VOLINN, ABRAHAMS, and PYLE, Bankruptcy Judges [1].

1. NOTE: This case was argued before Judges Volinn, Abrahams, and George but not decided when the Bankruptcy Amendments and Judgeship Act of 1984 went into effect on July 10, 1984. Judge George was appointed United States District Judge in the period between argument and decision. Since July 10, 1984, the parties to this appeal have consented to its de-termination by the newly constituted Bankruptcy Appellate Panels of the Ninth Circuit in accordance with 28 U.S.C. § 158(b). Bankruptcy Judge Ross M. Pyle of the Southern District of California was designated to replace Judge George in the consideration and determination of this matter.

## OPINION

PER CURIAM.

KENNETH BRUDER and ROLAND BANDY appeal from an order of the trial court, entered on February 1, 1982, authorizing the debtor-in-possession to assume and assign an unexpired sublease to real property owned by the appellants. We affirm.

## I. BACKGROUND

The appellants are the owners of certain commercial real property located in Dallas, Texas. This property is subject to a master lease, dated July 26, 1966, and a sublease to the debtor, PEACHES RECORDS AND TAPES, INC. (hereinafter referred to as "Peaches"), dated July 13, 1976. The latter sublease has a term extending to August 31, 1986, and the debtor's obligations under that lease are guaranteed by NEHI RECORD DISTRIBUTING CORPORATION (hereinafter referred to as "Nehi"). Through this sublease, Peaches operated one of approximately fifty (50) record stores prior to the commencement of its present Chapter 11 case.

The terms of the above sublease provide for a minimum annual rent of $491,000.00, with certain additional rents, including the payment of 1.5% of the proceeds of Peaches' gross sales in excess of $2,388,000.00. The lease further contains a clause retaining for the lessor the right of immediate reentry should the lessee or its guarantor become a bankrupt or insolvent or enter into any debtor proceedings. (The master lease has a similar provision.) The sublease also provides that

"Lessee will not assign this lease in whole or in part, nor sublet all or any part of the leased premises, without the prior written consent of Lessor in each instance. The consent by Lessor to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. This prohibition against assigning or subletting shall be construed to include a prohibition against any as-signment or subletting by operation of law ..."

On June 1, 1981, the debtors each filed a petition under Chapter 11 of the Bankruptcy Code. Their cases have since been substantively consolidated in the court below.

On November 5, 1981, the bankruptcy court entered an *ex parte* order permitting Peaches to deliver possession and management of several of its stores, including the Dallas location, to Bromo Distributors of Dallas, Inc., and to Bromo Distributors of Oklahoma, Inc. (hereinafter referred to, collectively, as "Bromo"), pursuant to the terms of a management agreement entered into between Bromo and these debtors on November 4, 1981. This action was, ostensibly, taken to clear the way for the eventual sale and assignment of these stores and their underlying leases to Bromo. No appeal was taken from the November 5, 1981, bankruptcy court order.

Following the entry of this order, on November 12, 1981, the debtors moved to assume the Dallas sublease and assign it to Bromo. In response, the appellants cross-moved and applied for an order denying the relief requested by the debtors, declaring the Dallas sublease terminated, and delivering to them possession of the Dallas real property.

Following a hearing held on January 22, 1982, the trial court entered its February 1, 1982 order allowing Peaches to assume the unexpired sublease and to assign it to Bromo. This order specifically held that the various provisions of 11 U.S.C. § 365, which permitted this assumption and assignment, were constitutional under the Fifth Amendment of the United States Constitution. The order further provided that (1) Peaches cure an existing default for the nonpayment of the May 1981 rent, (2) the appellant, KENNETH BRUDER, serve the debtors' counsel an itemized demand for an additional sum needed to cure existing defaults under the sublease, and (3) further adequate assurance of future performance be granted the appellant through a guarantee executed by an entity known as South

Warehouse of Dallas, Inc.[2] Following the entry of this order, the instant appeal ensued.

## II. ANALYSIS OF THE ISSUES OF FACT AND LAW

The appellants cite six grounds for overturning the lower court's decision. First, the appellants question the jurisdiction of the trial court, as an Article I adjunct court of bankruptcy, to enter its February 1, 1982 order. They, then, set forth two distinct grounds for maintaining that 11 U.S.C. § 365, as enacted and as applied in the instant case, violates the Fifth Amendment of the United States Constitution. The appellants' fourth argument addresses an alleged abandonment of the Dallas premises by Peaches. They claim that this abandonment was a sufficient basis in itself for denying the debtors' attempt to assume and assign the Dallas sublease.

As their fifth assignment of error, the appellants maintain that the Chapter 11 filing by Nehi, as a guarantor of the sublease, was an enforceable ground for terminating the Dallas sublease, which ground did not fall within the *ipso facto* clause provisions of 11 U.S.C. § 365(b)(2) and (e)(1). Finally, Bruder and Bandy argue that the payment of rent on the basis of a percentage of gross sales was in the nature of a financial accommodation, which rendered the sublease nonassumable and nonassignable under 11 U.S.C. § 365(c)(2).[3]

### A. *The Jurisdiction of the Bankruptcy Court*

The appellants ground their jurisdictional complaints against the trial court's order in the recent landmark decision of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon*, the United States Supreme Court found the broad jurisdiction granted the bankruptcy courts by section 241 of the Bankruptcy Reform Act of 1978 to be in excess of that which could properly be granted a court created under Article I of the United States Constitution. Nevertheless, the panel notes that both the *Marathon* plurality and its concurrence agreed to apply this June 28, 1982, decision only in a prospective fashion and to stay its effect, ultimately, until December 24, 1982. *Id.* at 88, 92, 102 S.Ct. at 2880, 2882.

In response to this concern, the appellants argue that the retrospective application of the *Marathon* holding does not affect decisions which were not "final" at the time the mandate in that case went into effect. In this regard, they claim that the February 1, 1982 order of the lower court was not a final disposition, since it 1) required subsequent acts to be performed and 2) was appealed to a higher tribunal.

■ With respect to the latter argument, we hold that the mere fact that an otherwise final order or judgment has been appealed does not mean that its finality is suspended for jurisdictional purposes under the *Marathon* decision. To the contrary, we believe that this interpretation of the *Marathon* prospectivity holding was rejected by the United States Supreme Court in their recent opinion in *United States v. Security Industrial Bank*, 459 U.S. 70,

**2.** The appellants have informed this panel of several failures by the debtor to obey these provisions of the trial court's order. Such matters, however, should be addressed to the lower court, which is in a much better position to consider enforcement of its February 1, 1982, order.

**3.** Although not stated as a specific issue on appeal, the appellants also argue that the trial court's approval of the assignment of this sublease and the sale of the Dallas business to Bromo represents an attempt to resolve Peaches' debt problems, through the sale of all its assets, without the disclosure, voting, and con-

firmation protections afforded by a formal plan of reorganization. The record before us, however, does not reflect that this transaction represented anything more than the transfer of a small portion of the assets of the Peaches estate. Without question, it was considered to be an integral part of the overall reorganization effort by Peaches. Nevertheless, we do not find evidence, in this sale and assignment alone, that there was an intent by the debtor to finesse the process of proposing and obtaining a confirmation of a plan of reorganization, while disposing of all or a substantial portion of its assets.

103 S.Ct. 407, 74 L.Ed.2d 235 (1982). In that case, the court specifically refused the request of an appellee to apply its *Marathon* ruling to an appeal from a pre-June 28, 1982 bankruptcy court judgment. *Id.* at 74 n. 5, 103 S.Ct. at 410 n. 5.

■ The question of whether the bankruptcy court's February 1, 1982 order was, in itself, final is only slightly more problematic. Although certain acts remained to be performed by the parties after the entry of the lower court's order, no additional adjudication of rights and duties was necessary. The court was left only to enforce its order in accordance with its specific terms. In defining a "final order," for purposes of determining jurisdiction on appeal, the United States Court of Appeals for the Ninth Circuit has stated that

" '[a] decision which finally determines the rights of parties to secure in that suit the relief they seek is a "final decision".' Colliers, *supra,* p. 787. An interlocutory order or decree is one which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which required further steps to be taken in order to enable the court to adjudicate the cause on the merits. Collier, *supra,* p. 792, citing *Goldie v. Carr,* 116 F.2d 335 (9th Cir.1940.)"

*In re Merle's Inc.,* 481 F.2d 1016 (9th Cir. 1973).

We conclude that the order of the lower court finally and fully determined the rights of these parties and was, therefore, a final order for purposes of jurisdictional determinations under the *Marathon* decision.

As a final jurisdictional argument, the appellants noted in oral argument that the jurisdiction of this panel might also be questionable under the *Marathon* decision. On this point, we would only note that the Ninth Circuit Court of Appeals has approved the jurisdiction of the panels in cases such as the one now before us. *See In re Burley,* 738 F.2d 981 (9th Cir.1984).[4]

*B. 11 U.S.C. § 365 and Fifth Amendment "Taking" and Due Process*

■ Although stated as two separate issues, the appellants' Fifth Amendment due process arguments have a single focus. The appellants maintain that their right to terminate the lease with Peaches and to regain possession of their real property upon default is a vested real property right. They then argue that this right cannot be "taken" from them retrospectively[5] as was allegedly done in the present case by the trial court's application of the *ipso facto,* anti-default, and assumption/assignment provisions of 11 U.S.C. § 365.[6]

---

4. *See also Pacemaker Diagnostic Clinic of America v. Instromedix,* 725 F.2d 537 (9th Cir.1984).

5. In rendering our decision in this matter, we must, at least tacitly, hold that the applicable provisions of 11 U.S.C. § 365 were meant to be applied retrospectively. In addition to the "gap" in the bankruptcy laws which would be left by a prospective-only application, *see In re Sambo's Restaurants, Inc.,* 24 B.R. 755 (Bankr. 9th Cir. 1982), *Matter of National Shoes, Inc.,* 20 B.R. 55 (Bankr.S.D.N.Y.1982), we would again observe that the assumption and assignment provisions of 11 U.S.C. § 365 are simply a continuation of existing bankruptcy principles and that the *ipso facto* clauses are a statutory expansion of a previously-existing equitable doctrine. *See* discussion at 15–16. Hence, this case differs from *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), where the Court held that statutes which eliminate the existing property rights of parties should be applied only prospectively, unless a

contrary congressional command has been given. *See Id.,* 103 S.Ct., at 414.

6. The so-called *"ipso facto"* clauses are those provisions in executory contracts and unexpired leases which result in a breach solely due to the financial condition or the bankruptcy filing of a party. Section 365(e)(1) makes such clauses generally unenforceable, subject to certain exceptions found in section 365(e)(2). Section 365(b)(2) further provides that a default arising from a breach of such a clause need not be cured by the trustee in order to assume that executory contract or unexpired lease.

Sections 365(a) and (b) permit the trustee to assume an executory contract or unexpired lease, subject to court approval and the need to 1) cure, or to give adequate assurance of a prompt cure of defaults, 2) compensate parties other than the debtor for actual pecuniary loss, and 3) provide adequate assurance of future performance. If there has been a default in an

We agree with the appellants that their lease termination and reentry rights are part of the general "bundle of rights" which forms their interest in the subject real property. We do not, however, believe that there was an unconstitutional "taking" of those rights by the trial court. "[N]ot every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960). In particular, a significant distinction has, traditionally, been observed between governmental action which deprives a property owner of his entire interest and governmental regulation which "affect[s] some but not all of the 'bundle of rights' which constitute the 'property' in question." *United States v. Security Industrial Bank,* 459 U.S. at 76, 103 S.Ct. at 411, *citing Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

In the latter type of case, the courts have recognized that all governmental regulation is going to have some economic impact—often adverse—upon property values. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). The degree to which this economic impact constitutes an unconstitutional "taking" is determined by what may appear to be an ill-defined *ad hoc* standard. *Kaiser Aetna v. United States,* 444 U.S. 164, 174–75, 100 S.Ct. 383, 389–90, 62 L.Ed.2d 332 (1979). Nevertheless, factors that have been considered to determine whether a taking has occurred have included the extent of the economic impact of the regulation in question, the degree of interference with primary and reasonable investment-backed expectations of the property owner, the amount of interference with existing property use, and the character of the governmental action in question. *See id.; Penn Central Transportation Company v. City of New York, supra,* 438 U.S. at 136, 98 S.Ct. at 2665; *PruneYard Shopping Center v. Robins, supra,* 447 U.S., at 83, 100 S.Ct. at 2041.

With respect to the character of a governmental action, alleged to be a taking, the United States Supreme Court has observed that

"[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., *United States v. Causby,* 328 U.S. 256, 90 L Ed 1206

unexpired lease, other than under an *ipso facto* clause, "the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease." 11 U.S.C. § 365(b)(4). Section 365(c)(1) precludes the assumption and assignment of personal service agreements, when other "applicable" law excuses performance, unless the other party consents to the assumption and/or assignment. Section 365(c)(2) prevents the assumption or assignment of contracts "to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."

With respect to the assignment of executory contracts or unexpired leases, 11 U.S.C. § 365(f) provides:

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

[66] S.Ct. 1062 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."

*Penn Central Transportation Company v. City of New York, supra* at 124, 98 S.Ct. at 2659. We believe that the governmental "action," contemplated by the *ipso facto,* anti-default, and assumption/assignment provisions of 11 U.S.C. § 365, is directed entirely at an adjustment of the "benefits and burdens" resulting from the vicissitudes of our national economy. Furthermore, these provisions do not interfere, in any significant way, with the primary economic expectations of a lessor or with existing property uses. Indeed, to assume an unexpired lease, a trustee must, by curing existing defaults and compensating actual pecuniary loss, return the landlord to his condition prior to the debtor's default. For the trustee to assign the lease, he must provide adequate assurance of future performance by the assignee. 11 U.S.C. § 365(b)(1). Should the assignee default, the lessor retains his entire battery of contractual and statutory termination and reentry rights for use against this assignee.

█ Without question, the lessor does suffer some delay in instituting these remedial procedures against his original lessee and there is always a risk that these delays will result in an uncollectible claim for unpaid rents against a debtor lessee should the latter ultimately decide to reject the lease. Still, the fact that bankruptcy legislation may delay a property owner in regaining control or possession of his property does not result in a denial of due process to that property owner, provided that such delays are subject to the discretionary supervision of the court of bankruptcy. *Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed.

1490 (1938); *Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 460–64, 57 S.Ct. 556, 560–63, 81 L.Ed. 736 (1937). This discretionary supervision may be found in the control exercised by the bankruptcy court over estate property and over the conditions upon which it will permit the assumption and assignment of unexpired leases.

With respect to the reasonable investment-backed expectations of lessors, it should be noted that section 70b of the Bankruptcy Act, existing at the initiation of both the master lease and sublease in this case, also invalidated general non-assignment covenants or conditions in leases. 11 U.S.C. § 110b (1976).[7] Although this same provision did permit the enforcement of express covenants terminating a lease, based upon an assignment by operation of law or the bankruptcy of a specified party to the lease, that language was not deemed to preclude a court of equity from refusing to enforce such a provision "if compelling equitable and policy considerations so require[d]." *In re Huntington Limited,* 654 F.2d 578, 583–84 (9th Cir.1981). We must, therefore, conclude that the appellants' economic expectations in purchasing their real property were presumptively limited by these bankruptcy rights, which were, even at the time the lease was written, available to their lessees.

In any event,

"[n]ot only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."

*Home Bldg. & Loan Assoc. v. Blaisdell,* 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934). Hence, the appellants purchased this real property "subject to [the] constitutional power in the Congress to legislate the subject of bankruptcies . . . in a manner consonant with the Fifth

---

**7.** The pertinent language of section 70b, 11 U.S.C. § 110b (1976), provided as follows:

"A general covenant or condition in a lease that it shall not be assigned shall not be construed to prevent the trustee from assuming the same at his election and subsequently assigning the same; but an express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same is enforce[a]ble."

Amendment." *Wright v. Union Central Life Ins. Co., supra*, 304 U.S., at 502, 516, 58 S.Ct. at 1025, 1033. We believe that this bankruptcy power included Congress' authority to permit the cure, assumption and assignment of unexpired leases and to deny the enforcement of *ipso facto* clauses in cases under Title 11 of the United States Code.

As a final due process consideration, we hold that 11 U.S.C. § 365, as written and as applied by the lower court, is not "unreasonable, arbitrary or capricious," and that it constitutes a rational means for adjusting the relationship between financially-troubled lessees, their lessors, and their other creditors, and that it manifests a "real and substantial relation to the objective sought to be attained." *See Nebbia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934).

### C. The Issue of Abandonment

█ Although the appellants' abandonment argument is somewhat vague, it appears to find its basis in paragraph 6 of an addendum to the sublease with Peaches. This provision grants the lessors the right to cancel the lease if Peaches ceases to do business on the leased premises. While the management agreement, approved by the trial court on November 5, 1981, and the assignment, sanctioned by that court in the order now under appeal, did effectively remove Peaches from the leased premises and replace it with Bromo, neither led to a cessation of business on those premises. To the extent that paragraph 6 would go beyond merely precluding such a cessation of business and prevent Peaches from assigning its lease to another party, pursuant to a sale of its business, we believe that it would be unenforceable, as a *de facto* nonassignment clause, under 11 U.S.C. § 365(f).

Aside from the sale and assignment of Peaches' business and lease to Bromo, we fail to find any action by this debtor which may be deemed an abandonment of the leased premises. The appellants' argument on this issue does not, therefore, serve as an adequate basis for overturning the lower court's order.

### D. A Chapter 11 Filing by a Guarantor

█ Assuming, *arguendo*, that 11 U.S.C. § 365(e)(1) does constitutionally preclude the enforcement of a termination provision in an unexpired lease based upon the "insolvency or financial condition of the *debtor*," the appellants, nevertheless, maintain that this clause does not prevent them from cancelling the lease because of the Chapter 11 filing of Peaches' *guarantor*, Nehi. This argument does not, however, properly recognize the effect of the consolidation of the Peaches and Nehi petitions, in rendering these parties into a single debtor, for purposes of the Bankruptcy Code. We hold that this consolidation made 11 U.S.C. § 365(e)(1) applicable to the termination clauses found in the master lease and sublease, which rely upon the insolvency of both Peaches and its guarantor, Nehi.

### E. The Financial Accommodation Issue

█ One of the primary exceptions to the right of a trustee to assume an executory contract involves the situation in which the contract is "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor." 11 U.S.C. § 365(c)(2). A similar provision permits the enforcement of *ipso facto* clauses in this type of contract. 11 U.S.C. § 365(e)(2)(B). The appellants argue that paragraph 2 of their sublease with Peaches, which provides for the payment of additional rents based upon a percentage of gross sales, represents a financial accommodation which renders the sublease unassumable and its *ipso facto* clause enforceable. They also contend that the existence of the Nehi guarantee similarly prevents the assumption of and creates a default in the sublease.

Neither argument is persuasive to this panel. The percentage of gross sales standard, adopted by paragraph 2 in determining the amount of rent owed by Peaches to the appellants, is merely one of the means adopted by the parties to measure the rental value of the property. As the appellees observe, the appellants have no contractual recourse under this provision should sales fall below the point at which these percent-

age rents become payable. And, as the appellees also note, 11 U.S.C. § 365(b)(3)(B) specifically contemplates the assumption and assignment of shopping center leases containing similar percentage rent provisions.

### III. CONCLUSION

We find nothing in the arguments of the appellants or in the trial record which persuades us that the trial court exceeded its jurisdiction or otherwise erred in the entry of its February 1, 1982 order.

AFFIRMED.