268 F.3d 712 (9th Cir. 2001)
 IN RE: SOUTHERN PACIFIC FUNDING CORPORATION, DEBTOR.
SPIEKER PROPERTIES, L.P., APPELLANT
v.
THE SPFC LIQUIDATING TRUST, AND BANK OF NEW YORK; HSBC BANK USA; SOUTHERN PACIFIC FUNDING CORPORATION, APPELLEES
 No. 00-35019
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 12, 2001
Filed October 15, 2001
 
 David W. Criswell, Ball Janik Llp, Portland, Oregon, for the appellant.
 Gregg D. Johnson, Ater Wynne Llp, Portland, Oregon, for appellee Bank of New York, Indenture Trustee.
 Edward Fox, Pryor Cashman Sherman & Flynn Llp, New York, New York, for appellee Hsbc Bank Usa, Indenture Trustee.
 Appeal from the United States District Court for the District of Oregon; Malcolm F. Marsh, District Judge, Presiding. D.C. No. CV 99-1613 MFM
 Before: Thompson, Tashima, and Graber, Circuit Judges.
 Tashima, Circuit Judge:
 
 
 1
 This appeal challenges the bankruptcy court's confirmation of the Second Amended Plan of Reorganization (the"Plan") of Debtor Southern Pacific Funding Corporation ("SPFC"), in a case under Chapter 11 of the Bankruptcy Code. The challenge is brought by Appellant Spieker Properties, SPFC's landlord and an unsecured creditor.[1] Appellees are the liquidating trust created by the Plan and the trustees under the indenture agreement that is the focus of Spieker's objections. The district court had jurisdiction over Spieker's appeal pursuant to 28 U.S.C. &#167 158(a), and it affirmed the bankruptcy court. It held that enforcement of the subordination provisions at issue did nothing to alter the rights or obligations of the debtor in violation of 11 U.S.C. &#167 365(e). We have jurisdiction over this timely appeal pursuant to 28 U.S.C.&#167 158(d), and we affirm the district court.
 
 I. Background
 
 2
 In 1996, SPFC entered into an indenture agreement (the "Indenture") regarding the issuance by SPFC of"convertible subordinated notes" (the "Notes") in an aggregate principal amount of approximately $86 million. Sections 12.1-12.12 of the Indenture are its subordination provisions. They subordinate payment on the Notes to payment of "Senior Indebtedness." The Indenture defines "Senior Indebtedness" as essentially any indebtedness (as defined by the contract) of SPFC that "by its terms . . . it is stated to be not superior in right of payment to the Notes." Indenture at 7."Indebtedness" does not include ordinary trade debt, so Senior Indebtedness does not include it, either.
 
 
 3
 Section 12.2 of the Indenture provides that, when Senior Indebtedness matures or is in default, no payments may be made to holders of the Notes until the Senior Indebtedness is paid in full or the default is cured. See id. &#167 12.2(a). Section 12.2 further provides that if any payments are made on the Notes in violation of section 12.2, those payments must be turned over to the Senior Indebtedness until the Senior Indebtedness is paid in full or the default is cured. See id. &#167 12.2(c).
 
 
 4
 Section 12.3 of the Indenture provides that in the event of dissolution, liquidation, reorganization, or distribution of the assets of SPFC, the Senior Indebtedness must be paid in full before any payments are made on the Notes. See id. &#167 12.3(a). Like section 12.2, section 12.3 further provides that if any payments are made on the Notes before the Senior Indebtedness is paid in full, those payments must be turned over to the Senior Indebtedness until the Senior Indebtedness is paid in full. See id. &#167 12.3(c). But section 12.3 contains an additional provision that section 12.2 lacks: It provides that in the event of dissolution, liquidation, reorganization, or distribution of assets, any payments to which the holders of the Notes would be entitled, were it not for the subordination provisions, must be paid to the Senior Indebtedness, in addition to any payment to which the Senior Indebtedness is already entitled, until the Senior Indebtedness is paid in full. See id.&#167 12.3(b). That is, the Senior Indebtedness receives a "double dividend" in the section 12.3 context--it gets its share plus any share to which the holders of the Notes would otherwise be entitled.[2]
 
 
 5
 The provisions of the Plan, as confirmed by the bankruptcy court, mirror the provisions of section 12.3 of the Indenture. That is, the Plan provides for the payment of double dividends to Senior Indebtedness--it gets its own share plus the share to which the holders of the Notes would otherwise be entitled. See Plan &#167 3.2.6(b) (providing that"until [the claims of Senior Indebtedness] have been paid in full, all Distributions of Available Cash that would be payable to [holders of the Notes] in the absence of the Subordination Provisions shall be distributed Pro Rata to the [holders of Senior Indebtedness]").
 
 
 6
 In the bankruptcy court, Spieker objected to this provision of the Plan on the ground that it enforced section 12.3 of the Indenture, which Spieker argued violated 11 U.S.C. &#167 365(e)(1). That provision prohibits the termination or modification of an executory contract, or any right or obligation thereunder, solely on the basis of a provision of the contract that is conditioned on insolvency of the debtor. See 11 U.S.C. &#167 365(e)(1). Spieker argued that the Indenture was an executory contract, that section 12.3 purported to modify SPFC's payment obligations conditioned on SPFC's insolvency, and that section 12.3 was therefore invalid under &#167 365(e)(1).
 
 
 7
 The bankruptcy court approved the Plan and rejected Spieker's argument, apparently on the grounds that: (1) under 11 U.S.C. &#167 510(a), a subordination agreement is to be enforced according to its terms; and (2) if Spieker's argument were accepted, it would essentially put all unsecured debt on a par with Senior Indebtedness.
 
 
 8
 On appeal, the district court rejected Spieker's argument as well, but for a different reason. It held that enforcement of section 12.3 does not violate &#167 365(e)(1), because section 12.3 "does nothing to alter the rights or obligations of the debtor."
 
 II. Standard of Review
 
 9
 The district court's decision on an appeal from a bankruptcy court is reviewed de novo. Gruntz v. County of Los Angeles (In re Gruntz), 202 F.3d 1074, 1084 n.9 (9th Cir. 2000) (en banc). This court therefore applies the same standard of review applied by the district court. Beaupied v. Chang (In re Chang), 163 F.3d 1138, 1140 (9th Cir. 1998). Factual determinations are reviewed for clear error, while legal conclusions and mixed questions of law and fact are reviewed de novo. Id.
 
 III. Discussion
 
 10
 Section 365 of the Bankruptcy Code deals generally with executory contracts and unexpired leases. It empowers the bankruptcy trustee to "assume or reject any executory contract or unexpired lease of the debtor," subject to court approval. 11 U.S.C. &#167 365(a). "[A] contract is executory if the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." Unsecured Creditors' Comm. of Robert L. Helms Constr. & Dev. Co. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co.), 139 F.3d 702, 705 (9th Cir. 1998) (en banc) (citation and internal quotation marks omitted).
 
 
 11
 Section 365(e)(1), the specific provision at issue here, provides:
 
 
 12
 Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on [the insolvency of the debtor].
 
 
 13
 11 U.S.C. &#167 365(e)(1). This section was intended to deal with contractual ipso facto clauses, according to which the insolvency of a party automatically terminates the contract or constitutes a material breach.[3] See generally H.R. Rep. No. 95-595, at 348-49 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05 (stating that &#167 365(e) "invalidates ipso facto[ ] or bankruptcy clauses," which "automatically terminate the contract . . . , or permit the other contracting party to terminate the contract . . . , in the event of bankruptcy"); see also Bruder v. Peaches Records & Tapes, Inc. (In re Peaches Records & Tapes, Inc.), 51 B.R. 583, 587 n.6 (B.A.P. 9th Cir. 1985). By invalidating such clauses, &#167 365(e)(1) promotes the rehabilitation of the debtor by enabling the bankruptcy trustee to assume (and thus continue in force) beneficial contracts that otherwise would have terminated automatically or would have been terminated by the other contracting party. See H.R. Rep. No. 95-595, at 348-49, reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05 (noting that enforcement of ipso facto clauses "frequently hampers rehabilitation efforts"). In short, the purpose of &#167 365(e)(1) is to protect the debtor from the enforcement of unfavorable insolvency-triggered clauses in executory contracts.
 
 
 14
 Spieker contends that section 12.3 is invalid under &#167 365(e)(1) because the Indenture is an executory contract and section 12.3 modifies SPFC's obligations under the Indenture, conditioned on SPFC's insolvency. It then argues that, because the Plan enforces section 12.3, the Plan violates 11 U.S.C. &#167 1129(a)(1), which requires that a plan comply with applicable provisions of the Bankruptcy Code. Appellees counter that Spieker's argument must be rejected for various reasons: (1) Section 510(a) of the Bankruptcy Code requires that the subordination provisions be enforced; (2) the Indenture is not in relevant respects an executory contract; (3) section 12.3 does not modify SPFC's obligations under the Indenture; (4) section 12.3 is not conditioned on insolvency within the meaning of &#167 365(e)(1); and (5) acceptance of Spieker's argument would upset settled expectations in the capital markets, because the payment of double dividends to senior debt is a standard practice on which market participants have long relied.
 
 
 15
 It is clear at the outset that Spieker's argument seeks to apply &#167 365(e)(1) in a context in which it evidently was never intended to be used. The point of &#167 365(e)(1) is to protect the debtor from enforcement against it of unfavorable insolvency-triggered provisions in executory contracts, not-as Spieker asserts--to protect the financial interests of an unsecured creditor seeking to vitiate the seniority rights of its secured counterparts. In addition, the payment of double dividends to senior creditors appears to be a standard practice that Congress did not intend to alter. The legislative history of the Bankruptcy Reform Act of 1978, of which &#167 365(e)(1) was a part, includes a lengthy discussion of an example involving the payment of double dividends, and the discussion appears to assume that the payment of double dividends in bankruptcy is simply a part of what it means for one class of debt to be subordinated to another. See H.R. Rep. No. 95-595, at 416-17 (1978), reprinted in 1978 U.S.C.C.A.N. 6372-73 (discussing a number of variations of an example in which "trade creditors, senior debt, and subordinate debt are each owed $100 and the plan proposes to pay the trade debt $15, the senior debt $30, and the junior debt $0"). That discussion shows that Congress took for granted the propriety of paying double dividends in cases like this one.[4]
 
 
 16
 Spieker's rejoinder is that strict statutory interpretation must trump any policy-based or market-based analyses of &#167 365(e)(1), and that that interpretation should be applied to negate the operation of section 12.3, because it constitutes the modification of the subordination provisions of an executory contract contingent upon the debtor's insolvency. Even assuming arguendo, however, that the Indenture constitutes an executory contract under &#167 365(e)(1), we conclude that the statute cannot be applied to invalidate the Plan's distribution scheme.
 
 
 17
 In particular, we agree with appellees that section 12.3 did not cause a post-insolvency modification of any rights or obligations under the Indenture, which would trigger the application of &#167 365(e)(1). It is not necessary to resolve the disagreement among the parties as to whether &#167 365(e)(1) applies exclusively to debtors, since it seems clear in this case that none of the parties can claim that application of section 12.3 altered its rights or obligations within the meaning of the statute.
 
 
 18
 To begin with, it is undisputed that the Indenture provisions at issue have no application to Spieker, which is neither a Note holder nor a holder of Senior Indebtedness. Spieker's claim, instead, is that in the bankruptcy context, section 12.3's allocation of payments to holders of Senior Indebtedness through the double-dividend scheme dissipates the pool of money that it otherwise would be entitled to claim for debt repayment prior to bankruptcy. The subordination arrangement, however, does not modify any of Spieker's prebankruptcy rights; to the contrary, as appellees point out, under the Indenture, Spieker's interest was technically the same pre-and post-bankruptcy.
 
 
 19
 It is true, of course, that SPFC's insolvency adversely affects Spieker's financial interest in its leasehold. This results from the initiation of bankruptcy itself, however, and not from the application of section 12.3. Of course Spieker would have been in a better position to enforce its interest against SPFC prior to the initiation of bankruptcy proceedings --at that point, SPFC would theoretically have had sufficient resources to cover such a claim, irrespective of the status of its other obligations. Even if SPFC had defaulted on one of its obligations to a Senior Indebtedness holder, Spieker still could have sought to enforce its lease, despite the fact that SPFC would have had to forgo payments to subordinated Note holders. The advent of insolvency, however, fundamentally changed this situation because it meant that SPFC's assets could not cover all of its obligations simultaneously--that is the very definition of bankruptcy. Thus, in the bankruptcy context, Spieker's rights vis a vis SPFC are clearly injured, but it is its status as an unsecured creditor, not the application of the Indenture's subordination provisions, that diluted its financial position.
 
 
 20
 Neither does section 12.3 alter the rights of the holders of Notes or Senior Indebtedness in the bankruptcy context. Under either section 12.2 or section 12.3, the order of priority in receiving payments is identical--the holders of Senior Indebtedness are entitled to full payment ahead of the Note holders under either provision. Although the application of section 12.3's double-dividend requirement might change the rate of repayment or the amount of payments directed to the senior creditors, the underlying subordination regime--and, therefore, the contractual rights of the debt holders covered by the Indenture--remains unchanged. That is, under sections 12.2 and 12.3 alike, the holders of the Notes are not to receive any payments until Senior Indebtedness is paid off and, if they do, they are required to turn those payments over to the senior creditors.[5]
 
 
 21
 Therefore, the issue boils down to whether section 12.3 would modify the debtor's obligation to make payments to creditors pursuant to the subordination scheme set forth in section 12.2. A close analysis of the arrangement described in the Indenture shows that it would not. Although it is true that section 12.3 is distinct from section 12.2 to the extent that it requires the payment of double dividends to satisfy the debtor's obligations to the holders of Senior Indebtedness, this does not dispose of the issue. Under the Indenture, the debtor's obligation is to make holders of Senior Indebtedness whole before paying holders of subordinated Notes. That obligation does not change based on whether section 12.2 is applied in the pre-bankruptcy context or section 12.3 is applied after the debtor has become insolvent. Instead of constituting a contract modification, the double-dividends provision is only a mechanism to ensure in bankruptcy the same result that would apply before bankruptcy--that the holders of Senior Indebtedness receive full payment ahead of the Note holders. In this sense, application of the section 12.3 subordination provision does nothing to modify the debtor's obligation, which consistently remains to protect the repayment rights of senior creditors. The double-dividends requirement is simply a way to ensure that when the limited assets of a debtor are parceled out in bankruptcy, senior debt holders receive their payments before their junior or unsecured counterparts. This is no different than what would occur before bankruptcy under the Indenture and, for this reason, we conclude that &#167 365(e)(1) does not apply.
 
 
 22
 Based on this analysis, Spieker's contention that section 12.3 constitutes a modification of the Indenture conditioned on SPFC's insolvency must fail, because section 12.3 does not operate to alter any of the parties' rights under the agreement. To the contrary, as the bankruptcy court noted, it is Spieker's interpretation of &#167 365(e)(1) that would work a drastic modification of the Indenture in this case, because applying Spieker's logic would wipe out the priority rights of senior debt holders clearly contemplated by the Indenture and elevate unsecured creditors to a level of parity with their secured counterparts. This interpretation contradicts the intention of the parties and flies in the face of long-established industry practice. We reject it as inconsistent with both the text and intent of &#167 365(e)(1).[6]
 
 IV. Conclusion
 
 23
 For the foregoing reasons, the district court did not err in affirming the bankruptcy court's confirmation of the Plan. The judgment of the district court is therefore
 
 
 24
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Subsequent to the commencement of this appeal, Spieker Properties, L.P., was merged into EOP Operating Limited Partnership. For convenience, we continue to refer to Appellant as Spieker.
 
 
 [2]
 Spieker misapprehends the effect of section 12.3 in claiming that under it, "SPFC is required to make distributions to the Subordinated Noteholders, and they are required to turn those monies over to the holders of Senior Indebtedness." Section 12.3 does not require SPFC to make any payments to the holders of the Notes; in fact, section 12.3 prohibits any payment to the holders of the Notes until Senior Indebtedness has been paid in full. What section 12.3 does require is that SPFC pay directly to the holders of Senior Indebtedness any payments to which the holders of the Notes would otherwise be entitled. See Indenture &#167 12.3(b). It further provides that, notwithstanding the provisions of section 12.3, in the event that payments are made to the holders of the Notes, such payment shall be "held in trust" for the benefit of the holders of the Senior Indebtedness. See id. &#167 12.3(c).
 
 
 [3]
 Actually, &#167 365(e)(1) applies to clauses conditioned on "(A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under[the Bankruptcy Code]; or (C) the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement." 11 U.S.C. &#167 365(e)(1)(A), (B), (C). For the sake of simplicity, we will generally use "insolvency" as a catchall, intending it to cover each of the provisions of &#167 365(e)(1).
 
 
 [4]
 In addition, we are not unmindful of the fact that more than $6.8 trillion in debt securities and bank loans have been extended in reliance on the type of subordination agreement that Spieker asks us to invalidate. See Response Br. of Amicus Am. Bankers Ass'n at 2 (citing Fed. Fin. Inst. Examination Council, Trust Assets of Fin. Inst. 1997, at 96 (1998); Fed. Reserve Statistical Release, Assets and Liabilities of Commercial Banks in the United States (Jan. 1998)), filed in the district court.
 
 
 [5]
 Spieker's misapprehension of section 12.3 and the subordination provisions of the Plan clouds this issue. See note 2, supra. Spieker erroneously contends that section 12.3 requires SPFC to make payments to the holders of the Notes, who are then obligated to turn over those payments to Senior Indebtedness. This contention makes it appear that section 12.3 modifies the rights of the holders of the Notes because, according to Spieker, section 12.3 requires payments to the Note holders (although the Note holders are then required to turn over those payments to Senior Indebtedness), while section 12.2 forbids such payments. All of this reasoning is mistaken. In fact, neither section 12.3 nor the subordination provisions of the Plan require payments to the holders of the Notes (until Senior Indebtedness is paid in full). Thus, contrary to Spieker's argument, the payment of double dividends does not in any way contravene section 12.2. Rather, the payment of double dividends is neither required nor forbidden by section 12.2.
 
 
 [6]
 Spieker also argues that the bankruptcy court erred in applying 11 U.S.C. &#167 510(a) to enforce the subordination provisions, because it cannot be used to override the statutory requirements of &#167 365(e)(1). Because we have concluded that &#167 365(e)(1) does not apply to the Indenture in this case, we need not reach this argument.