**In re PARKER REFRIGERATED SERVICE, INC., Debtor.**

**In re PARKER REFRIGERATED "FILED RATE" CASES.**

**Kenneth D. BEYER, Trustee, Plaintiff,**

**v.**

**BEND MILLWORKS, et al., Cook Family Foods, Ltd., et al., Agripac, Inc., et al., American Truckload Transportation, et al., Bill Street Company, et al., James River Corporation, Continental Mills, Inc., C.H. Belt & Associates, International Paper Co., Bargreen–Ellingson, Inc., Stein Distributing Inc., Turner & Pease Co., Treasure Chest Advertising Company, Inc., Powell River–Alberni Sales Corporation, Crystal Geyser Water Company, Fred Meyer, Inc., Domino's Pizza Distribution Corp., Farmer John Meat Company, et al., Great Western Chemical Co., Hi–Country Foods Corp., Chevron USA, Inc., et al., Arctic Ice Cream, et al., All Freight Services, Inc., et al., McKeeson Drug Corporation, Associated Foods Services dba Alumock Food Service, et al., Super Valu, Inc., Archer Daniels Midland Company dba Centennial Mills, et al., Defendants.**

Bankruptcy No. 92–31206.
Adv. Nos. 94–30270, 93–34153 to 93–34157, 93–34184 to 93–34195, 93–34430, 93–34457, 94–30466, 94–30471, 94–30472, 94–30695, 94–30791, 94–30801, 94–30811 and 94–30913.

United States Bankruptcy Court,
W.D. Washington.

Aug. 5, 1994.

---

Hugh McGavick, Tacoma, WA, for trustee.

Jill Lunn, Office of U.S. Trustee, Seattle, WA.

Jack J. Cullen, J. Todd Tracy, Foster Pepper & Shefelman, Seattle, WA, for Bend Millwork Systems, Inc.

Kenneth R. Mitchell, Tacoma, WA, for K & L Distributors & Northwest Office Furniture Sales.

Peter A. Greene, Thompson, Hine and Flory, Washington, DC, for Cook Family Foods.

William J. Stohler, Morris Plains, NJ, for Warner–Lambert Co.

Richard A. Derham, Davis Wright Tremaine, Seattle, WA, for National Frozen Foods.

Michael D. Gallagher, Perkins Coie, Seattle, WA, for Continental Mills.

Stephen A. Smith, Preston Thorgrimson Shidler Gates & Ellis, Seattle, WA, for C.H. Belt & Associates.

Paul J. Lawrence, Preston Thorgrimson Shidler Gates & Ellis, Seattle, WA, for Saffola.

Jerome R. Aiken, Meyer, Fluegge & Tenney, Yakima, WA, for Yakima Coca–Cola Bottling Co.

Jack R. Davis, Keith R. Baldwin, Allison, Davis & Baldwin, Seattle, WA, for Stein Distributing, Spirit II Distributing and D & D Transp.

Michael D. Dwyer, Lane Powell Spears Lubersky, Seattle, WA, for Turner & Pease Co. and Simpson Tacoma Kraft Co.

Frederic L. Wood, Michael G. Kane, Washington, DC, for C.H. Belt & Associates.

Kenneth S. Kessler, Tacoma, WA, for Bargreen–Ellingson.

Andrew C. Gauen, Judith W. Constans, Merrick, Hofstedt & Lindsey, Seattle, WA, for Drackett Products.

Russell A. Evans, Seattle, WA, for McKesson Drug Co.

Michael W. Feinberg, Hiscock & Barclay, Seattle, WA, for Super Valu Inc. and Hazelwood Farms Bakeries.

Bruce G. MacIntyre, Mark S. Nadler, Bogle & Gates, Seattle, WA, for Treasure Chest Advertising Co., James River Corp., Midland Foods Dist. and J.R. Food Service, Inc.

Augello, Pezold & Hirschmann, Huntington, NY, for Treasure Chest Advertising Co., James River Corp., Midland Foods Dist., J.R. Food Service, Inc., Stanely Hardware and Mirror Prod.

Andrew D. Shafer, Seattle, WA, for Powell River–Alberni Sales Corp.

Robert J. Gallagher, Northampton, MA, Edwin C. Perry, Tonkon, Thorp, Galen, Marmaduke & Booth, Portland, OR, for Crystal Geyser Water Co.

Ann M. Holmes, David B. Levant, Stoel Rives Boley Jones & Grey, Seattle, WA, for Fred Meyer.

Debora Dunlap, David M. Soderland, Dunlap & Soderland, Seattle, WA, for Domino's Pizza.

Joseph E. Shickich, Jr., Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, for Cook Family Foods.

Kevin John Witasick, Kathleen Masters, Phoenix, AZ, for Southwest Cold Storage.

Floyd Short, Seattle, WA, for Saffola.

Matthew Anderton, Velikanje, Moore & Shore, Yakima, WA, for Hi–Country Foods Corp.

Ilene P. Karpf, Parsippany, NJ, for Nabisco Foods Co.

Lawrence E. Martin, Halverson & Applegate, Yakima, WA, for Tree Top, Inc.

Stanley Tate, Seattle, WA, for Darigold, Inc.

Kevin Bay, Ryan Swanson & Cleveland, Seattle, WA, for Arctic Ice Cream.

Joanne Henry, Vandeberg Johnson & Gandara, Tacoma, WA, for Seattle–Tacoma Box Co.

Bruce G. MacIntyre, Bogle & Gates, Seattle, WA, for Stanley Hardware/Mirror Products.

Greg W. Haffner, Davis Baldwin & Haffner, Seattle, WA, for Allied Sysco Food Svc., Sysco Corp. and Sygma Network.

Robert B. Walker, Joseph L. Steinfeld, Jr., Washington, DC, for Kenneth Beyer, trustee.

## DECISION RE: NEGOTIATED RATES ACT OF 1993

PHILIP H. BRANDT, Bankruptcy Judge.

Parker Refrigerated Service, Inc., an interstate trucking company, operated briefly after its 13 March 1992 Petition for Relief

under Chapter 11 of the Bankruptcy Code [1] and before conversion to a case under Chapter 7 on 30 September 1992. Kenneth Beyer, the Trustee, later brought these 27 adversary proceedings to recover freight undercharges. The Trustee seeks to recover a total of $1,134,449.36 from 120 Defendants. The claims range from a low of $332.76 to a high of $113,447.63, averaging $9,453.

I consolidated the adversary proceedings for the limited purpose of considering common issues of law, the first being whether the remedies provided by the Negotiated Rates Act of 1993, P.L. 103–180, 107 Stat. 2044 (3 December 1993) ("NRA" or "Act") [2], are available to the Defendants in these adversary proceedings. I conclude they are.

## I. BACKGROUND

In accordance with the Order re: Limited Consolidation ... entered 27 January 1994, I heard the following on St. Patrick's Day, 17 March 1994:

1. The motion of Turner & Pease in A93–34190, for declaratory judgment that the NRA, applies to these proceedings;

2. The motions of James River Corporation in A93–34184, Treasure Chest Advertizing Co. Inc. in A93–34191, and of Farmer John Meat Co. in A93–34430, for stay of proceedings and referral to the Interstate Commerce Commission ("ICC");

3. The motion of Powell River–Alberni Sales Corp. in A93–34192, for summary judgment of dismissal;

4. The motion of C.H. Belt & Associates, Inc. in A93–31486, for dismissal or summary judgment; and

5. The motion of Cook Family Foods, Ltd. in A93–34154, for stay of proceedings (to allow referral to ICC).

In accordance with the Order re: Limited Consolidation ..., numerous Defendants filed joinders in the various motions.

Additionally, the Trustee filed a second wave of similar cases, and I entered a second Order re: Limited Consolidation ... on 24 March 1994, bringing those cases within this consolidated proceeding for the determination of the common legal issues. As the parties to those cases will be affected, and had no opportunity to be heard, I circulated a tentative version of this decision, and set a hearing to consider any comments or objections. That hearing was held 21 July 1994.

Some of the moving parties also sought determinations of questions other than the effect of the NRA upon these proceedings: for example, whether that defendant's dealings with Parker were contract instead of common carriage, whether particular exceptions of the Interstate Commerce Act ("ICA", 49 U.S.C.) might apply, or that the defendant is a small business protected by the NRA, or that reformation of that defendant's contract with Parker should be granted. I do not here decide those questions.

## II. JURISDICTION

These are core proceedings and this Court has jurisdiction. 28 U.S.C. §§ 157(b)(1) and (b)(2)(O) and 1334; GR 7, Local Rules W.D.Wash.

## III. DISCUSSION

No particular purpose would be served by recounting here the history and purposes of the filed rate doctrine: see Justice Brennan's opinion for the Court in *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Under

---

**1.** 11 U.S.C.: Except as noted in footnote 1, all chapter and section references are to the Bankruptcy Code, and all Rule references are to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated. The Local Bankruptcy Rules, W.D.Wash., are cited LBR.

**2.** Set out in Appendix A. References herein to sections numbered with single digits are to the NRA.

the doctrine, common carriers whose rates are regulated by the ICC (and their trustees in bankruptcy) may collect the difference between the rates the carrier actually charged shippers and the pertinent rate in the tariff on file with the ICC, notwithstanding an otherwise enforceable agreement between the carrier and the shipper to the contrary. Historically, the doctrine was seen as a means to prevent carriers from offering illegal rebates or discounts to favored shippers, contrary to 49 U.S.C. § 10741.

The Motor–Carrier Act of 1980 ("MCA"), P.L. 96–296, 94 Stat. 793, substantially deregulated the industry. The following years were turbulent in the trucking industry, and a number of carriers became insolvent. "Filed rate" or "undercharge" suits by those carriers and their trustees proliferated. The ICC attempted, by rule-making, to preclude carriers from collecting under the doctrine as an unreasonable practice contrary to 49 U.S.C. § 10701. The Supreme Court rejected that approach in *Maislin*, as the MCA did not repeal or modify the tariff filing requirement.

In *Reiter v. Cooper*, 507 U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), the Supreme Court held that, where the plaintiff seeking to collect under the filed rate doctrine was the bankruptcy trustee of an insolvent carrier, the ordinary rules governing counterclaims applied to the shipper's "unreasonable rate" defense, and reversed the Circuit Court's holding that the shipper must pay the filed rates and later seek damages if the ICC finds the rates unreasonable.

A. *NRA:* It is clear from the legislative history, extensively recounted in *Cooper, Trustee v. E.I. Du Pont de Nemours & Co. (In re Bulldog Trucking, Inc.)*, 173 B.R. 517 (W.D.N.C.1994),[3] that Congress's central purpose in enacting the NRA was to address undercharge claims brought by bankruptcy trustees.

Section 2(a) of the NRA added a new section (f) to 49 U.S.C. § 10701. New subsections (2) and (3) provide settlement procedures, available at the shipper's election, for claims pending on or made within two years after the NRA's enactment (3 December 1993), if:

1. the carrier is no longer transporting property (or is only doing so to avoid application of the NRA's settlement procedure);

2. the carrier offered and the shipper reasonably relied on and paid a rate other than that the carrier had filed with the ICC;

3. the carrier did not properly or timely file with the ICC; and

4. the carrier later demanded payment of the higher rate in a filed tariff.

The court in which the undercharge complaint is brought is to decide the first question, and the ICC, the latter three. New subsection (1).

The shipper may settle an undercharge claim by paying 20% of the difference between the tariff rate and the rate paid, for shipments less than 10,000 pounds, and 15% for larger shipments. New subsections (2) and (3).

Small business concerns, charitable organizations, and shippers of recyclables[4] are exempted by new subsection (9) from any liability for the difference. There is nothing in the NRA which reports to limit the court's jurisdiction to determine whether or not this exoneration from liability is available to a particular defendant.

Section 2(e) legislatively overrules *Maislin* with respect to undercharges incurred before 30 September 1990 sought by non-operating carriers. Somewhat ambiguously, subparagraph (1) provides that such collection attempts "shall be an unreasonable practice", while subparagraph (2) provides that the ICC can determine whether the attempt is an unreasonable practice. Pending such de-

---

**3.** The District Court has granted summary judgment in favor of the trustee, on the Bankruptcy Court's recommendation, in this case. 173 B.R. 517 (W.D.N.C.1994). Counsel advises an appeal to the Fourth Circuit has been taken.

**4.** As defined in, respectively, the Small Business Act, 15 U.S.C. § 631 et seq., 26 U.S.C. § 501(c)(3), and 49 U.S.C. § 10733.

termination, the shipper need not pay the undercharge.

The NRA is, by § 2(c), expressly made applicable to suits pending on the date of enactment, as were a number of the Parker Refrigerated adversary proceedings. According to the Trustee's counsel, giving affect to the NRA in these proceedings would largely eliminate his claims against the defendants. He submits that § 9 of the NRA, which provides:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974[.]

precludes that result. The Trustee contends that, since the NRA remedies are available only when the carrier is no longer operating, the Act runs afoul of the Bankruptcy Code.

B. *Bankruptcy Code:* The Code's anti-forfeiture provisions[5] generally preclude enforcement of contractual, lease, and statutory *ipso facto* clauses against the Trustee. Such default and termination provisions, or restrictions on transfer to or from a debtor's estate, are conditioned upon the insolvency or financial condition of the debtor, or the filing of a petition for relief. In particular, the Trustee asserts the NRA conflicts with § 541(c)(1), which provides

" . . . an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable non-bankruptcy law— . . . (B) that is conditioned upon the insolvency or financial condition of the debtor . . . and that effects

or gives an option to effect a forfeiture, modification, or termination of the debtor's instrument in property[.]"

and § 363(*l*), providing

" . . . the trustee may use, sell, or lease property . . . notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor . . ., and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property."

In the Trustee's view, the availability of NRA § 2 remedies is predicated upon the debtor's financial condition:

The words *"motor carrier"* and *"no longer transporting property"* are the key statutory words in the NRA that condition the application of Sections 2(a)–(c) and (e)–(g) on the financial condition of Parker and other defunct motor carriers of property:

(1) *"Motor carrier"* is statutorily defined in 49 U.S.C. § 10102(13)–(15). *See* 49 U.S.C. § 10102(13). These provisions specify that "motor carrier" means either a motor common carrier *"for compensation"* (49 U.S.C. § 10102(13)–14)), or a motor contract carrier *"for compensation"* (49 U.S.C. § 10102(13) and (15)).[6]

(2) Thus, a "motor carrier" of property that "is no longer transporting property" within the meaning of Sections 2(a)–(c) and (e)–(g) of the NRA means a motor carrier of property *for compensation* that is no longer transporting property *for compensation.* In plain English, this statutory language means "a motor carrier that is no longer generating revenues from current transportation of property." By definition, any such motor carrier has a "financial condition" characterized by a lack of reve-

---

5. Sections 363(*l*), 365(e)(1), and 541(c)(1).

6. 49 U.S.C. § 10102(13) provides that "motor carrier" means "a motor common carrier and a motor contract carrier."

49 U.S.C. § 10102(14) provides that "motor common carrier" means "a person holding itself out to the general public to provide motor vehicle transportation *for compensation* over regular or irregular routes, or both." (Emphasis added.)

49 U.S.C. § 10102(15)(B) provides that a "motor contract carrier" of property means "a per-

son providing motor vehicle transportation of property *for compensation* under continuing agreements with one or more persons...." (Emphasis added.)

49 U.S.C. § 10521, which appears in subchapter II of chapter 105 of Title 49 (*see* Section 2(a) of H.R. 2121), gives the ICC jurisdiction "over transportation by motor carrier," which, by reason of 49 U.S.C. §§ 10102(13)–(15), means "transportation by motor carrier *for compensation.*" (Emphasis added.)

nues from ongoing transportation of property.

Part I.B.3.a. of the Trustee's Memoranda of Law in Opposition ... [to the various motions] (footnote omitted; emphasis in original).

Additionally, the Trustee extensively recounts legislative history supporting the proposition that Congress had defunct and bankrupt carriers very much in mind in enacting the NRA, and not an abstract category of business entities which simply decided to leave the trucking business. The Trustee argues that the NRA's remedies effect an optional forfeiture or a modification of the estate's interest in the undercharge claims based on insolvency or financial condition. The Defendants respond that a carrier's operating status is not that carrier's "financial condition": a prosperous carrier can, for whatever reason, decide to leave the trucking business, and deploy its capital and resources importing widgets, raising potatoes, or operating a casino, while a carrier in financial distress (including a debtor under the Code) can continue to operate. The two views are not mutually exclusive: while a carrier's operational status does not necessarily signify its financial condition, its operational status does affect the carrier's financial condition, whether its carriage is profitable or not.

## IV. ANALYSIS

Only if the NRA remedies conflict with the Code is it necessary to construe § 9.

■ A. *Applicable law:* There is little room for doubt that the NRA is "applicable non-bankruptcy law" or "applicable law" within the meaning of the Code sections, *Patterson v. Shumate,* 504 U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992), and no defendant contends that it is not.

■ B. *Section 541(c)(1):* This section is focused on clauses which affect the estate's initial acquisition of the debtor's property interest, and has no role in determining the use, extent, or composition of those interests. *In re Polycorp Assoc., Inc.,* 47 B.R. 671, 672 (Bankr.N.D.Cal.1985) and *In re Farmers*

*Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir. 1986). No Defendant contends that the Debtor's undercharge claims are not now held by the Trustee: there is no conflict between the NRA and § 541(c)(1).

C. *Section 363(l):*

■ In addition to *Bulldog Trucking, supra,* p. 709, there are now a number of reported cases dealing with the NRA as it may affect undercharge claims of trustees, including:

*Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.,* 1994 WL 150154 (M.D.Tenn., 14 February 1994);

*Jones Truck Lines, Inc. v. Afco Steel, Inc.,* 849 F.Supp. 1296 (E.D.Ark.1994);

*Lewis, Trustee of Edison Express, Inc. v. H.E. Wisdom & Sons, Inc.,* 1994 WL 110659 (N.D.Ill., 31 March 1994);

*Hoarty, Trustee v. Midwest Carriers Corp. (In re Best Refrigerated Express, Inc.),* 168 B.R. 978 (Bankr.D.Neb.1994)

*Jones Truck Lines, Inc. v. Grinnell Corporation Anvil Products Division,* 167 B.R. 488 (N.D.Ill.1994).

*Jones Truck Lines, Inc. v. Frigid Fluid Company,* 169 B.R. 52 (N.D.Ill.1994).

*Lou Allen v. Spiegel, Inc. and United Pool Distribution,* 169 B.R. 394 (N.D.Ill.1994).

*Scroggins v. Thomson Consumer Electronics, Inc. (In re Brown Transport Truckload),* 169 B.R. 781 (N.D.Ga.1994).

*De'Medici, Trustee v. FDSI Management Group (In re Lifeschultz Fast Freight Corp.),* —— B.R. ——, 1994 WL 322606 (Bankr.N.D.Ill., 1 July 1994).

Additionally, counsel have submitted with their pleadings several unreported decisions, including the Honorable Irving Hill's in *Gumport, Trustee v. Sterling Press (In re Transcon Lines),* No. CV 94–1248–IH, (C.D.Cal., 28 March 1994 [7]).

In each of these cases, except *Bulldog Trucking,* the court took quite literally the "insolvency or financial condition" triggering requirement, and concluded the NRA did not transgress § 541(c)(1) or, in *Best Refrigerat-*

---

7. Transcript of 22 March 1994 hearing and Summary Judgment Order of 28 March 1994. Counsel advises this decision has been appealed to the Ninth Circuit.

ed, § 363(*l*). None, except *Bulldog Trucking,* engaged in much analysis of that question beyond observing that operating status and financial condition are not identical. In each instance, except *Bulldog Trucking,* the court looked at the legislative history of the NRA and found clear Congressional intent that the new statute apply to actions brought by bankruptcy trustees.

The court in *Bulldog Trucking, supra,* p. 709, reached the contrary conclusion, relying extensively on legislative history to show Congress was targeting carriers in bankruptcy, and their trustees, in enacting the NRA.

Beyond the NRA cases, there is little pertinent authority. Most of the cases dealing with the various anti-forfeiture provisions of the Code do so in the context of contractual or statutory provisions which explicitly operate upon insolvency or the filing of a bankruptcy petition. Those cases are not particularly helpful here.[8] However, what authority there is, not addressed in the other NRA cases, supports the Trustee's position and the *Bulldog Trucking* analysis:

> *Connolly, Trustee v. Nuthatch Hill Assoc. (In re Manning),* 831 F.2d 205 (10th Cir.1987), the court reversed a District Court and remanded for the Bankruptcy Court to determine whether the parties intended a particular termination provision to operate in the event of a partner's bankruptcy, and further to reexamine the conclusion that the buy-out terms were not invalidated by §§ 541(c) and 363(*l*). The buy-out provision provided for a discount, if applicable, but made no reference to bankruptcy. The court cited with approval *Holland America Ins. Co. v. Sportservice, Inc. (In re Cahokia Downs, Inc.),* 5 B.R. 529, 531 (Bankr.S.D.Ill.1980) (§ 363(*l*) voids insurance contract provision where the prime reason for canceling was bankruptcy) and *Gulf Tampa Drydock Co. v. Insurance Co. of North America (In re Gulf Tampa Drydock Co.),* 49 B.R. 154,

156–57 (Bankr.M.D.Fla.1985) (§ 363(*l*) bars cancellation of insurance policies).

*In re Peaches Records & Tapes, Inc.,* 51 B.R. 583 (9th Cir. BAP 1985) affirmed the assignment of a lease by a debtor-in-possession. The Appellate Panel rejected the contention (described as "somewhat vague") that a provision in the lease documents which authorized the lessor to terminate the lease if the lessee debtor seized to do business on the premises precluded assignment of the lease, saying that such an interpretation "... would be unenforceable, as a *de facto* no assignment clause under 11 U.S.C. § 365(f)." 51 B.R. at 590.

Finally, in *In re Tom Stimus Chrysler–Plymouth, Inc.,* 134 B.R. 676 (Bankr. M.D.Fla.1991), the Court without extensive discussion, invalidated under § 365 a Florida statute providing that a motor vehicle dealer who was not engaged in business with the public for ten consecutive business days an abandoned a franchise, without elaboration.

The non-NRA cases stand for the principle that a statute or contractual provision predicated on cessation of operations is invalid when it is sought to be enforced against a debtor or trustee. The prime case, other than the NRA decisions, which Defendants rely upon in opposition is *In re Gull Air, Inc.,* 890 F.2d 1255 (1st Cir.1989), in which the court held that the Federal Aviation Administration had not violated the automatic stay (§ 362) in reallocating the debtor airline's LaGuardia take-off and landing slots. By regulation, a carrier's interest in its slots terminated if not utilized 65 per cent of the time over a two-month period, and the debtor argued the FAA was stayed from withdrawing and reallocating those slots. Unfortunately for this analysis, the First Circuit did not address any of the anti-forfeiture provisions in its decision; it is not clear such issues were argued. *Gull Air* does not support Defendants' position.

Focusing on the texts of § 363(*l*) and the NRA[9], I conclude that the Section 2 reme-

---

8. Although only § 363(*l*) remains at issue here, because Congress used identical phraseology in each of them: "... conditioned on ... insolvency or financial condition ...", cases under the other anti-forfeiture provisions pertain.

9. The legislative history, if I may consider it (see part IV.D.2. below), supports the Trustee's argument. Certainly I would invalidate a lease or contractual provision, or a state statute, on

dies would effect a partial forfeiture, modification or termination ... of the Trustee's undercharge claims. In this case, the debtor's non-operational status results directly from its financial condition, and the NRA would (at least partially) forfeit, modify, or terminate some of the trustee's undercharge claims. Section 2 of the NRA and the Code conflict.

**D.** *Section 9:* What does § 9 mean in directing that the NRA not be construed "... as limiting or otherwise affecting application of ...", the Bankruptcy Code, the Judicial Code, or ERISA?

1. *Contentions:* The Trustee contends that changing his remedies against the Defendants would limit or affect the application of the Bankruptcy Code, because he would otherwise be entitled to recover the undercharges he seeks in these proceedings (at least to the extent that the Parker tariff rates were reasonable). Since the Bankruptcy Code and the non-bankruptcy law in existence prior to the NRA procedurally and substantively established his rights against the Defendants, and giving effect to the NRA would change the scope of those rights, and thus, he argues, change the application of the Bankruptcy Code. He argues, ultimately, that the legislative history, particularly an exchange of correspondence between the House Committee Chairs, discloses a Congressional realization that the NRA would affect application of the Bankruptcy Code, and an agreement that § 9 be added to preclude its having any effect in bankruptcy cases.

The Defendants have not extensively addressed § 9. Their specific arguments are that that section was added by the House to allay jurisdictional concerns, and that there is no conflict between the statutes. The second contention is a restatement of the argument rejected in part IV. C., above. As for the first, Defendants rely on floor statements by the prime sponsors of HR 2121 (the House version of the bill) and in exchange of correspondence between the Chairmen of the House Committees on Public Works and Transportation and on the Judiciary, Pp. 16

equivalent evidence of its being focused on insol-

and 17, H.Rept. 103–359 (1993), which raises the question of the propriety of my consulting that legislative history.

2. *Legislative History:* None of the NRA cases finds the NRA ambiguous or addresses the propriety of consulting legislative history, nor have the parties. However, in a recent bankruptcy decision, the Ninth Circuit has reiterated:

... the traditional tools of statutory construction. The interpretation of statutory provision must begin with the plain meaning of its language. *Pennsylvania Public Welfare Dept. v. Davenport,* 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Where statutory language is unambiguous the judicial inquiry is complete. *Connecticut Nat. Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). It is a cardinal principle of statutory construction that a court must give effect, if possible, to every clause and word of a statute. *Negonsott v. Samuels,* —— U.S. ——, ——, 113 S.Ct. 1119, 1123, 122 L.Ed.2d 457 (1993). When the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language. *United States v. Ron Pair Enterp., Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989).

*In re Bonner Mall Partnership,* 2 F.3d 899, 908 (9th Cir.1993) *cert. granted sub nom. U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994).

Applying these principles, if the NRA is coherent and consistent, I cannot disregard § 9, nor can I resort to legislative history unless that section is ambiguous, or its language has no plain meaning.

**3.** *Coherence/Consistency:* The NRA, a dense and complex statute, amends an extensive and complex statutory scheme, the ICA. The argument for inconsistency or incoherence focuses on the perceived clash between § 9 and the remedies provided in § 2. The Trustee and the Defendants agree that excising bankruptcy cases from the NRA would leave very few cases which it

vents, debtors, or bankruptcy trustees.

might affect. That is also the import of the legislative history, although neither numbers of cases nor magnitudes of claims within and without bankruptcy are detailed. The Defendants appeal to the legislative history, including purpose statements in the committee reports and numerous floor statements, to show that the Congress wished to staunch the propensity of bankruptcy trustees of defunct carriers to sue shippers.

It would be tautological to rely upon legislative history to determine whether I may properly consult legislative history. I decline to do so, and look only to the NRA itself. Without authoritative statistics regarding the relative scopes of undercharge in bankruptcy and outside of bankruptcy, I have no basis to conclude the NRA is incoherent or inconsistent.

■ 4. *Ambiguity:* Whether allowing Defendants to avail themselves of the NRA's remedies would or otherwise affect *application* of the Bankruptcy Code depends upon the meaning of "application" in § 9. The *Webster's* definition is:

"1. The act of applying.... 3.a. The act of putting to a special use or purpose. b. A specific use to which something is put.... 4. Useability: relevance.... *Webster's Third New International Dictionary,* 105 (1969).

*Black's* defines "application" as "... the use or disposition made of a thing. A bringing together, in order to ascertain some relationship or establish some connection; as the application of a rule or principle to a case or fact...." *Black's Law Dictionary,* 99 (6th Ed.1990). "Apply" means:

To put, use, or refer, as suitable or relative; to coordinate language with a particular subject-matter; as to apply the words of a statute to a particular state of facts.

The work "apply" is used in connection with statutes in two senses. When construing a statute, in describing the class of persons, things, or functions which are within its scope; as that the statute does not "apply" to transactions in interstate commerce. When discussing the use made of a statute, in referring to the process by which the statute is made operative; as where the jury is told to "apply" the statute of limitation if they find that the cause of action arose before a given date. Id. at 99.

Likewise, among *Webster's* definitions of "apply" are:

...: to use for a particular purpose or in a particular case ... to have a valid connection, agreement, or analogy: to have a bearing: to be pertinent.... *Webster's,* at 105.

Recourse to the dictionaries does not provide a basis for choosing either proffered construction of § 9: choosing any of the pertinent possible meanings of "application" does not make one or the other more sensible, or answer the question of the scope of the section.

The Trustee's proposed reading of § 9, that it is inapplicable to cases brought by debtors or trustees in bankruptcy, is plausible. However, it is not the only plausible construction:

— the section might mean that the NRA does not affect rights created by the Bankruptcy Code, for example, preferences, as distinct from externally-derived rights which become part of the estate;

— it may mean merely that Congress intended to leave the Bankruptcy Code intact while implicitly amending it within the scope of the NRA; or,

— although it is somewhat less plausible from the text, it may be jurisdictional clarification, as Defendants contend.

The difficulty with Defendants' interpretation is that Title 28, the Judicial Code, contains the jurisdiction provisions affecting bankruptcy, and it is separately referenced in § 9. Why the reference to the Bankruptcy Code if only jurisdictional questions are being addressed?

In any event, § 9's meaning is not plain and unambiguous, and its legislative history may be considered to determine the meaning of the section.

■ 5. *Section 9:* Unfortunately, § 9's legislative history is sparse, comprised of an

exchange of letters between Committee Chairmen on 15 November 1993, and a few allusions in floor statements.

In his letter, the Honorable Jack Brooks, Chairman of the House Judiciary Committee, confirmed his understanding that language would be added to the bill to clarify that it was not intended to affect application of Title 28, relating to jurisdiction, and on that basis dropped his insistence that the bill be sequentially referred to the Judiciary Committee. The Honorable Norman Y. Mineta, Chairman of the Committee on Public Works and Transportation, responded: "... I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects [sic] either the Bankruptcy Code or the jurisdiction of the Bankruptcy Courts."[10] While Chairman Brooks was only expressing concern regarding jurisdictional issues, arguably Chairman Mineta (and the eventual § 9) went beyond those concerns.[11] However, the floor statements, such as those of Rep. Schuster, evidence only a focus on the jurisdictional aspects:

> The amendment to section 9 of H.R. 2121 ... clarifies the committee's intention that H.R. 2121 does not affect the jurisdiction of the courts of the United States, including bankruptcy courts, to determine any matter regarding a bankrupt carrier, other than determinations statutorily required by H.R. 2121 to be resolved by the ICC. The obligation of the court or bankruptcy court to refer any of these determinations to the ICC in accordance with this statute is mandatory and not discretionary. The committee intends in section 9 that the courts in which the bankrupt carrier's estate is being adjudicated should continue to make all other determinations necessary

to fully and finally wind up a bankrupt carrier's estate proceedings.

139 Cong.Rec. H9597 (daily ed. 15 November 1993). To the same effect, see the statements of Representatives Petri, Mineta and Brooks, at pp. H9598 and H9603. The opponents of the legislation had the same understanding:

> We should not be enacting one-sided legislation that comes down in favor of only one, or largely in favor of only one class of interests. H.R. 2121 effectively eliminates any possibility of former employees of bankrupt carriers from· recovering any portion of their claims in bankruptcy for back pay, severance, vacation, health and welfare and benefit claims.

Statement of Representative Oberstar, at H9599. *See also*, statement of Representative Blackwell, at H9601.

Likewise, when Senate considered the legislation for final passage (the House had substituted H.R. 2121 for the previously-passed S. 412), it understood that the amended legislation was designed to address the problems created by "the trustees of bankrupt trucking companies that had negotiated such [lower] rates ... suing shippers for the difference." Statement of Senator Danforth, 139 Cong.Rec. S16187 (daily ed. 18 November 1993). *See also* the remarks of Senator Hollings, Chairman of the Senate Committee on Commerce, Science, and Transportation, recommending the adoption of the House amendments, at S16186.

Going beyond the skimpy legislative history of § 9, and considering the legislative history of the entire NRA, it is abundantly clear that Congress intended to affect under-

---

**10.** H.Rep. No. 359, 103rd Cong., 1st. Sess., at 16 (1993). Partially reprinted, 1993 U.S.C.C.A.N. 2534–2544. The complete letters are set forth in Appendix B. Despite their order, it is evident from the first sentence of Chairman Mineta's letter that he is responding to Chairman Brooks's.

**11.** In his Objection ... to the Tentative Decision, the Trustee submits that the Chairmens' focus on jurisdiction and Title 28 is explained by the fact that HR 2121 already referenced Title 11. If that is the case, it is not clear from the legislative history. The version of § 9 contained in the amended version of HR 2121 contained in

H.Rep. 103–359 refers to Title 11 and ERISA, and not to Title 28, but nothing submitted establishes the timing of the report relative to Chairman Brooks's letter. An equally plausible explanation is that the Public Works and Transportation Committee members or staff drafted the amended version for the report, knowing the letter was coming from Chairman Brooks, and then revised the amended version after receipt of his letter and before presentation to the membership that day, in the form printed in the Congressional record, at H9593–H9596, in which § 9 also references Title 28.

charge claims held by bankruptcy trustees. See, for example, the purpose statements in the reports:

> The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates brought about by trustees for non-operating motor carriers for past transportation services.

H.Rep. 103–359, 103rd Cong. 1 Sess. (1993), at p. 7.

and

> The Bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by trustees for bankrupt motor carriers ·... to collect additional amounts for past transportation provided....

S.Rep. 103–79, 103rd Cong. 1 Sess. (1993), at p. 1. *See also,* the legislative history recounted in *Bulldog Trucking,* and *Best Refrigerated, supra,* p. 983.

 Even if a literal reading of § 9 compelled the result that filed rate actions in motor-carrier bankruptcies are unaffected by the NRA, I could consider legislative history to determine whether the statutory language comports with the drafters' intent. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 572–74, 102 S.Ct. 3245, 3250–52, 73 L.Ed.2d 973 (1982). Ambiguity is not a prerequisite. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242–44, 109 S.Ct. 1026, 1031–32, 103 L.Ed.2d 290 (1989).

The Trustee, who extensively cites members' statements in his arguments that § 2 violates the anti-forfeiture provisions of the code, cites none indicating that the NRA's remedies would not be available to shippers sued by bankruptcy trustees. His proposed construction is demonstrably at odds with the congressional purpose in enacting the NRA, and, if indeed most filed rate actions are brought by bankruptcy trustees, might well render the statute nugatory. I do not ascribe such cynicism to Congress. Section 9, properly construed, does not purport to insulate the undercharge claims of bankruptcy trustees from the NRA.

 *E. Conflict:* Since Congress intended the NRA to be available to these Defendants and § 2 of that Act conflicts with § 363(*l* ), one statute must give way. As the NRA is the more recent and more specific statute, it controls. *Hellon & Assoc. Inc. v. Phoenix Resort Corp.,* 958 F.2d 295 (9th Cir.1992). The Trustee, in his Objection ... to the Tentative Decision, contends there is no statutory conflict, but predicates his argument on his reading of § 9, rejected above. He further argues that §§ 363(*l* ) and 541(c)(1) are more specific than § 9, and that the Bankruptcy Code should therefore prevail. Implicitly the Trustee contends, without citing authority, that the analysis be done at the section or subsection level, rather than by comparison of the NRA to the Code, or of the remedial provisions of § 2 to the anti-forfeiture provisions of the Code. Viewed from either alternative perspective, the NRA is more specific: the Code applies to the vast bulk of the national economy, while the NRA applies, for a limited time period, to a portion of the controversies in a particular regulated industry. The same is true respecting the § 2 remedies, as compared to § 363(*l* ).

 The appropriate level of analysis is by statute, NRA v. Code, and the NRA is much more specific than the Code. The NRA does not purport to amend the Code, but to the extent of any conflict, the NRA displaces the Code in those limited situations to which it pertains.

## V. CONCLUSION

 Construction of the NRA is a pure question of law. *Mitchell v. U.S.,* 977 F.2d 1318, 1320 (9th Cir.1992). There being no factual issues, I will enter partial summary judgment, declaring the NRA applies to these proceedings. Rule 7056. As there is no just reason for delay, it will be a final judgment on that question. Rule 7054(a); F.R.Civ.P. 54(b).

I will stay further proceedings to allow Defendants who wish to petition the ICC. Defendants asserting they are exempted from liability as small business concerns, charitable organizations, or because their cargoes were recyclable material, will not be

stayed from bringing summary judgment motions on such bases. The summary judgment motions of Defendants C.H. Belt and Powell River–Alberni will be set for hearing on the specifics of their small business exemption and contract carriage allegations.

APPENDIX A

PUBLIC LAW 103–180—DEC. 3, 1993

107 STAT. 2044

Public Law 103–180

103rd Congress

S. 412

An Act

To amend title 49, United States Code, relating to procedures for resolving claims involving unfiled, negotiated transportation rates, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Negotiated Rates Act of 1993".

SEC. 2. PROCEDURES FOR RESOLVING CLAIMS INVOLVING UNFILED, NEGOTIATED TRANSPORTATION RATES.

(a) IN GENERAL.—Section 10701 of title 49, United States Code, is amended by adding at the end the following:

"(f) PROCEDURES FOR RESOLVING CLAIMS INVOLVING UNFILED, NEGOTIATED TRANSPORTATION RATES.—

"(1) IN GENERAL.—When a claim is made by a motor carrier of property (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title, by a freight forwarder (other than a household goods freight forwarder), or by a party representing such a carrier or freight forwarder regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier or freight forwarder for such transpor-

tation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—

"(A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; and

"(B) with respect to the claim—

"(i) the person was offered a transportation rate by the carrier or freight forwarder other than that legally on file with the Commission for the transportation service;

"(ii) the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;

"(iii) the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;

"(iv) such transportation rate was billed and collected by the carrier or freight forwarder; and

"(v) the carrier or freight forwarder demands additional payment of a higher rate filed in a tariff.

If there is a dispute as to the showing under subparagraph (A), such dispute shall be resolved by the court in which the claim is brought. If there is a dispute as to the showing under subparagraph (B), such dispute shall be resolved by the Commission. Pending the resolution of any such dispute, the person shall not have to pay any additional compensation to the carrier or freight forwarder. Satisfaction of the claim under paragraph (2), (3), or (4) of this subsection shall be binding on the parties, and the parties shall not be subject to chapter 119 of this title.

"(2) CLAIMS INVOLVING SHIPMENTS WEIGHING 10,000 POUNDS OR LESS.—A person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim if

the shipments each weighed 10,000 pounds or less, by payment of 20 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

"(3) CLAIMS INVOLVING SHIPMENTS WEIGHING MORE THAN 10,000 POUNDS.—A person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim if the shipments each weighed more than 10,000 pounds, by payment of 15 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

"(4) CLAIMS INVOLVING PUBLIC WAREHOUSEMEN.—Notwithstanding paragraphs (2) and (3), a person from whom the additional legally applicable and effective tariff rate or charges are sought may elect to satisfy the claim by payment of 5 percent of the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid if such person is a public warehouseman. In the event that a dispute arises as to the rate that was legally applicable to the shipment, such dispute shall be resolved by the Commission.

"(5) EFFECTS OF ELECTION.—When a person from whom additional legally applicable freight rates or charges are sought does not elect to use the provisions of paragraph (2), (3), or (4), the person may pursue all rights and remedies existing under this title.

"(6) STAY OF ADDITIONAL COMPENSATION.—When a person proceeds under this section to challenge the reasonableness of the legally applicable freight rate or charges being claimed by a carrier or freight forwarder described in paragraph (1) in addition to those already billed and collected, the person shall not have to pay any additional compensation to the carrier or freight forwarder until the Commission has made a determination as to the reasonableness of the challenged rate as applied to the freight of the person against whom the claim is made.

"(7) LIMITATION ON STATUTORY CONSTRUCTION.—Except as authorized in paragraphs (2), (3), (4), and (9) of this subsection, nothing in this subsection shall relieve a motor common carrier of the duty to file and adhere to its rates, rules, and classifications as required in sections 10761 and 10762 of this title.

"(8) NOTIFICATION OF ELECTION.—

"(A) GENERAL RULE.—A person must notify the carrier or freight forwarder as to its election to proceed under paragraph (2), (3), or (4). Except as provided in subparagraphs (B), (C), and (D), such election may be made at any time.

"(B) DEMANDS FOR PAYMENT INITIALLY MADE AFTER DATE OF ENACTMENT.—If the carrier or freight forwarder or party representing such carrier or freight forwarder initially demands the payment of additional freight charges after the date of the enactment of this subsection and notifies the person from whom additional freight charges are sought of the provisions of paragraphs (1) through (7) at the time of the making of such initial demand, the election must be made not later than the later of—

"(i) the 60th day following the filing of an answer to a suit for the collection of such additional legally applicable freight rate or charges, or

"(ii) the 90th day following the date of the enactment of this subsection.

"(C) PENDING SUITS FOR COLLECTION MADE BEFORE OR ON DATE OF ENACTMENT.—If the carrier or freight forwarder or party representing such carrier or freight forwarder has filed, before or on the date of the enactment of this subsection, a suit for the collection of additional freight charges and notifies the person from whom additional freight charges are sought of the provisions of paragraphs (1) through (7), the election must

be made not later than the 90th day following the date on which such notification is received.

"(D) DEMANDS FOR PAYMENT MADE BEFORE OR ON DATE OF ENACTMENT.—If the carrier or freight forwarder or party representing such carrier or freight forwarder has demanded the payment of additional freight charges, and has not filed a suit for the collection of such additional freight charges, before or on the date of the enactment of this subsection and notifies the person from whom additional freight charges are sought of the provisions of paragraphs (1) through (7), the election must be made not later than the later of—

"(i) the 60th day following the filing of an answer to a suit for the collection of such additional legally applicable freight rate or charges, or

"(ii) the 90th day following the date of the enactment of this subsection.

"(9) CLAIMS INVOLVING SMALL-BUSINESS CONCERNS, CHARITABLE ORGANIZATIONS, AND RECYCLABLE MATERIALS.—Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—

"(A) if such person qualifies as a small-business concern under the Small Business Act (15 U.S.C. 631 et seq.),

"(B) if such person is an organization which is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code, or

"(C) if the cargo involved in the claim is recyclable materials, as defined in section 10733.".

(b) CONFORMING AMENDMENT.—Subsection (e) of such section is amended by striking "In" and inserting "Except as provided in subsection (f), in".

(c) APPLICABILITY.—The amendments made by subsections (a) and (b) of this section shall apply to all claims pending as of the date of the enactment of this Act and to all claims arising from transportation shipments tendered on or before the last day of the 24–month period beginning on such date of enactment.

(d) REPORT.—Not later than 18 months after the date of the enactment of this Act, the Interstate Commerce Commission shall transmit to Congress a report regarding whether there exists a justification for extending the applicability of amendments made by subsections (a) and (b) of this section beyond the period specified in subsection (c).

(e) ALTERNATIVE PROCEDURE FOR RESOLVING DISPUTES.—

(1) GENERAL RULE.—For purposes of section 10701 of title 49, United States Code, it shall be an unreasonable practice for a motor carrier of property (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of such title, a freight forwarder (other than a household goods freight forwarder), or a party representing such a carrier or freight forwarder to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a tariff that is filed in accordance with chapter 107 of such title by the carrier or freight forwarder applicable to such transportation service and the negotiated rate for such transportation service if the carrier or freight forwarder is no longer transporting property between places described in section 10521(a)(1) of such title for the purpose of avoiding the application of this subsection.

(2) JURISDICTION OF COMMISSION.—The Commission shall have jurisdiction to make a determination of whether or not attempting to charge or the charging of a rate by a motor carrier or freight forwarder or party representing a motor carrier or freight forwarder is an unreasonable practice under paragraph (1). If the Commission determines that attempting to charge or the charging of the rate is an unreasonable

practice under paragraph (1), the carrier, freight forwarder, or party may not collect the difference described in paragraph (1) between the applicable rate and the negotiated rate for the transportation service. In making such determination, the Commission shall consider—

(A) whether the person was offered a transportation rate by the carrier or freight forwarder or party other than that legally on file with the Commission for the transportation service;

(B) whether the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;

(C) whether the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;

(D) whether the transportation rate was billed and collected by the carrier or freight forwarder; and

(E) whether the carrier or freight forwarder or party demands additional payment of a higher rate filed in a tariff.

(3) STAY OF ADDITIONAL COMPENSATION.— When a person proceeds under this subsection to challenge the reasonableness of the practice of a motor carrier, freight forwarder, or party described in paragraph (1) to attempt to charge or to charge the difference described in paragraph (1) between the applicable rate and the negotiated rate for the transportation service in addition to those charges already billed and collected for the transportation service, the person shall not have to pay any additional compensation to the carrier, freight forwarder, or party until the Commission has made a determination as to the reasonableness of the practice as applied to the freight of the person against whom the claim is made.

(4) TREATMENT.—Paragraph (1) of this subsection is enacted as an exception, and shall be treated as an exception, to the requirements of sections 10761(a) and 10762 of title 49, United States Code, relating to a filed tariff rate for a transportation or service subject to the jurisdiction of the Commission and other general tariff requirements.

(5) NONAPPLICABILITY OF NEGOTIATED RATE DISPUTE RESOLUTION PROCEDURE.—If a person elects to seek enforcement of paragraph (1) with respect to a rate for a transportation or service, section 10701(f) of title 49, United States Code, as added by subsection (a) of this section, shall not apply to such rate.

(6) DEFINITIONS.—For purposes of this subsection, the following definitions apply:

(A) COMMISSION, HOUSEHOLD GOODS, HOUSEHOLD GOODS FREIGHT FORWARDER, AND MOTOR CARRIER.—The terms "Commission", "household goods", "household goods freight forwarder", and "motor carrier" have the meaning such terms have under section 10102 of title 49, United States Code.

(B) NEGOTIATED RATE.—The term "negotiated rate" means a rate, charge, classification, or rule agreed upon by a motor carrier or freight forwarder described in paragraph (1) and a shipper through negotiations pursuant to which no tariff was lawfully and timely filed with the Commission and for which there is written evidence of such agreement.

(f) PRIOR SETTLEMENTS AND ADJUDICATIONS.—Any claim that, but for this subsection, would be subject to any provision of this Act (including any amendment made by this Act) and that was settled by mutual agreement of the parties to such claim, or resolved by a final adjudication of a Federal or State court, before the date of the enactment of this Act shall be treated as binding, enforceable, and not contrary to law, unless such settlement was agreed to as a result of fraud or coercion.

(g) RATE REASONABLENESS.—Section 10701(e) of title 49, United States Code, is amended by adding at the end the following: "Any complaint brought against a motor carrier (other than a carrier described in subsection (f)(1)(A)) by a person (other than a motor carrier) for unreasonably high rates

for past or future transportation shall be determined under this subsection.".

## SEC. 3. STATUTE OF LIMITATIONS.

(a) MOTOR CARRIER CHARGES.—Section 11706(a) of title 49, United States Code, is amended by striking the period at the end and inserting the following: "; except that a motor carrier (other than a motor carrier providing transportation of household goods) or freight forwarder (other than a household goods freight forwarder)—

"(1) must begin such a civil action within 2 years after the claim accrues if the transportation or service is provided by the carrier in the 1–year period beginning on the date of the enactment of the Negotiated Rates Act of 1993; and

"(2) must begin such a civil action within 18 months after the claim accrues if the transportation or service is provided by the carrier after the last day of such 1–year period.".

(b) MOTOR CARRIER OVERCHARGES.—Section 11706(b) of title 49, United States Code, is amended by striking ". If that claim is against a common carrier" and inserting the following: "; except that a person must begin a civil action to recover overcharges from a motor carrier subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title for transportation or service—

"(1) within 2 years after the claim accrues if such transportation or service is provided in the 1–year period beginning on the date of the enactment of the Negotiated Rate Act of 1993; and

"(2) within 18 months after the claim accrues if such transportation or service is provided after the last day of such 1–year period.

If the claim is against a common carrier".

(c) CONFORMING AMENDMENT.—Section 11706(d) of title 49, United States Code, is amended—

(1) by striking "3–year period" each place it appears and inserting "limitation periods";

(2) by striking "is extended" the first place it appears and inserting "are extended"; and

(3) by striking "each".

## SEC. 4. TARIFF RECONCILIATION RULES FOR MOTOR CARRIERS OF PROPERTY.

(a) IN GENERAL.—Chapter 117 of title 49, United States Code, is amended by adding at the end the following:

"§ 11712. Tariff reconciliation rules for motor common carriers of property

"(a) MUTUAL CONSENT.—Subject to Commission review and approval, motor carriers subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title (other than motor carriers providing transportation of household goods) and shippers may resolve, by mutual consent, overcharge and undercharge claims resulting from incorrect tariff provisions or billing errors arising from the inadvertent failure to properly and timely file and maintain agreed upon rates, rules, or classifications in compliance with sections 10761 and 10762 of this title. Resolution of such claims among the parties shall not subject any party to the penalties of chapter 119 of this title.

"(b) LIMITATION ON STATUTORY CONSTRUCTION.—Nothing in this section shall relieve the motor carrier of the duty to file and adhere to its rates, rules, and classifications as required in sections 10761 and 10762, except as provided in subsection (a) of this section.

"(c) RULEMAKING PROCEEDING.—Not later than 90 days after the date of the enactment of this section, the Commission shall institute a proceeding to establish rules pursuant to which the tariff requirements of sections 10761 and 10762 of this title shall not apply under circumstances described in subsection (a) of this section.".

(b) CONFORMING AMENDMENT.—The analysis for chapter 117 of title 49, United States Code, is amended by adding at the end the following:

"11712. Tariff reconciliation rules for motor common carriers of property.".

## SEC. 5. CUSTOMER ACCOUNT CODES AND RANGE TARIFFS.

(a) CUSTOMER ACCOUNT CODES.—Section 10762 of title 49, United States Code, is amended by adding at the end the following:

"(h) CUSTOMER ACCOUNT CODES.—No tariff filed by a motor carrier of property with the Commission before, on, or after the date of the enactment of this subsection may be held invalid solely on the basis that a numerical or alpha account code is used in such tariff to designate customers or to describe the applicability of rates. For transportation performed on and after the 180th day following such date of enactment, the name of the customer for each account code must be set forth in the tariff (other than the tariff of a motor carrier providing transportation of household goods)."

(b) RANGE TARIFFS.—Such section is further amended by adding at the end the following:

"(i) RANGE TARIFFS.—No tariff filed by a motor carrier of property with the Commission before, on, or after the date of the enactment of this subsection may be held invalid solely on the basis that the tariff does not show a specific rate or discount for a specific shipment if the tariff is based on a range of rates or discounts for specific classes of shipments. For transportation performed on or after the 180th day following such date of enactment, such a range tariff must identify the specific rate or discount from among the range of rates or discounts contained in such range tariff which is applicable to each specific shipment or must contain an objective means for determining the rate.".

## SEC. 6. CONTRACTS OF MOTOR CONTRACT CARRIERS.

(a) IN GENERAL.—Section 10702 of title 49, United States Code, is amended by adding at the end the following new subsection:

"(c) CONTRACTS OF CARRIAGE FOR MOTOR CONTRACT CARRIERS.—

"(1) GENERAL RULE.—A motor contract carrier providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title shall enter into a written agreement, separate from the bill of lading or receipt, for each contract for the provision of transportation subject to such jurisdiction which is entered into after the 90th day following the date of the enactment of this subsection.

"(2) MINIMUM CONTENT REQUIREMENTS.—The written agreement shall, at a minimum—

"(A) identify the parties thereto;

"(B) commit the shipper to tender and the carrier to transport a series of shipments;

"(C) contain the contract rate or rates for the transportation service to be or being provided; and

"(D)(i) state that it provides for the assignment of motor vehicles for a continuing period of time for the exclusive use of the shipper; or

"(ii) state that it provides that the service is designed to meet the distinct needs of the shipper.

"(3) RETENTION BY CARRIER.—All written agreements entered into by a motor contract carrier under paragraph (1) shall be retained by the carrier while in effect and for a minimum period of 3 years thereafter and shall be made available to the Commission upon request.

"(4) RANDOM AUDITS BY COMMISSION.—The Commission shall conduct periodic random audits to ensure that motor contract carriers are complying with this subsection and are adhering to the rates set forth in their agreements.".

(b) CIVIL PENALTY.—Section 11901(g) of such title is amended—

(1) by inserting "or enter into or retain a written agreement under section 10702(c) of this title" after "under this subtitle" the first place it appears; and

(2) by striking "or (5)" and inserting "(5) does not comply with section 10702(c) of this title, or (6)".

(c) CRIMINAL PENALTY.—Section 11909(b) of such title is amended—

(1) by inserting "or enter into or retain a written agreement under section 10702(c)

of this title" after "under this subtitle" the first place it appears; and

(2) in clause (1) by inserting after "make that report" the following: "or willfully does not enter into or retain that agreement".

## SEC. 7. BILLING AND COLLECTING PRACTICES.

(a) IN GENERAL.—Subchapter IV of chapter 107 of title 49, United States Code, is amended by adding at the end the following:

"§ 10767. Billing and collecting practices

"(a) REGULATIONS LIMITING REDUCED RATES.—Not later than 120 days after the date of the enactment of this section, the Commission shall issue regulations that prohibit a motor carrier subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title from providing a reduction in a rate set forth in its tariff or contract for the provision of transportation of property to any person other than (1) the person paying the motor carrier directly for the transportation service according to the bill of lading, receipt, or contract, or (2) an agent of the person paying for the transportation.

"(b) DISCLOSURE OF ACTUAL RATES, CHARGES, AND ALLOWANCES.—The regulations of the Commission issued pursuant to this section shall require a motor carrier to disclose, when a document is presented or transmitted electronically for payment to the person responsible directly to the motor carrier for payment or agent of such responsible person, the actual rates, charges, or allowances for the transportation service and shall prohibit any person from causing a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction. Where the actual rate, charge, or allowance is dependent upon the performance of a service by a party to the transportation arrangement, such as tendering a volume of freight over a stated period of time, the motor carrier shall indicate in any document presented for payment to the person responsible directly to the motor carrier

for the payment that a reduction, allowance, or other adjustment may apply.

"(c) PAYMENTS OR ALLOWANCES FOR CERTAIN SERVICES.—The regulations issued by the Commission pursuant to this section shall not prohibit a motor carrier from making payments or allowances to a party to the transaction for services that would otherwise be performed by the motor carrier, such as a loading or unloading service, if the payments or allowances are reasonably related to the cost that such party knows or has reason to know would otherwise be incurred by the motor carrier.".

(b) CONFORMING AMENDMENT.—The analysis for such subchapter is amended by adding at the end the following new item:

"10767. Billing and collecting practices.".

(c) VIOLATION.—

(1) IN GENERAL.—Section 11901 of such title is amended by redesignating subsection (*l*) as subsection (m) and by inserting after subsection (k) the following:

"(*l*) RATE DISCOUNTS.—A person, or an officer, employee, or agent of that person, that knowingly pays, accepts, or solicits a reduced rate or rates in violation of the regulations issued under section 10767 of this title is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which a party incurs because of such violation. Notwithstanding any other provision of this title, the express civil penalties and damages provided for in this subsection are the exclusive legal sanctions to be imposed under this title for practices found to be in violation of the regulations issued under section 10767 and such violations do not render tariff or contract provisions void or unenforceable.".

(2) VENUE.—Section 11901(m)(2) of such title (as redesignated by paragraph (1)) is amended by striking "or (k)" and inserting "(k), or (*l*)".

## SEC. 8. RESOLUTION OF DISPUTES RELATING TO CONTRACT OR COMMON CARRIER CAPACITIES.

Section 11101 of title 49, United States Code, is amended by adding at the end the following:

"(d) RESOLUTION OF DISPUTES RELATING TO CONTRACT OR COMMON CARRIER CAPACITIES.— If a motor carrier (other than a motor carrier providing transportation of household goods) subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title has authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Commission shall have jurisdiction to, and shall, resolve the dispute.".

## SEC. 9. LIMITATION ON STATUTORY CONSTRUCTION.

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

## APPENDIX B

The complete letters are:

HOUSE OF REPRESENTATIVES, COMMITTEE ON PUBLIC WORKS AND TRANSPORTATION
Washington, DC, November 15, 1993.

Hon. JACK BROOKS,
Chairman, Committee on the Judiciary,
Rayburn House Office Building, Washington, DC.

DEAR MR. CHAIRMAN: Thank you for your letter on H.R. 2121, the "Negotiated Rates Act of 1993."

Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue your request for a sequential referral.

I further recognize that in pursuing the referral, your action will in no way be construed as a waiver of any jurisdiction your Committee has relating to this issue. I will gladly include our exchange of correspondence on this matter in the Record during House consideration of H.R. 2121 and in any report by the Committee on Public Works and Transportation on H.R. 2121.

Sincerely yours,

NORMAN Y. MINETA,
Chair, Committee on Public Works and Transportation

HOUSE OF REPRESENTATIVES
COMMITTEE ON THE JUDICIARY
Washington, DC, November 15, 1993.

Hon. NORMAN Y. MINETA,

Chairman, Committee on Public Works and Transportation,
Rayburn House Office Building, Washington, DC.

DEAR MR. CHAIRMAN: On November 9, 1993, the Committee on Public Works and Transportation ordered reported H.R. 2121, the "Negotiated Rates Act of 1993."

As you know under Rule X of the Rules of the House of Representatives, our Committee has jurisdiction over "bankruptcy" and "Federal Courts" [see Rule X, Clause 1(1)(3) & (6)]. Based on this jurisdiction, we are concerned that H.R. 2121, as current drafted, could be construed to limit or otherwise affect application of Title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts). On the basis of these concerns and others, our Committee has requested sequential referral of the bill.

However, it is my understanding that as a result of staff discussions on this issue, amended language will be included in the version of H.R. 2121 to be called-up on suspension that will make it clear that nothing in the bill shall be construed as limiting or otherwise affecting application of Title 28, United States code, relating to the jurisdic-

tion of the courts of the United States (including bankruptcy courts).

Based on these assurances, such a change in statutory language would also create circumstances whereby the Judiciary Committee would withdraw its request for a sequential referral. This particular waiver, however, should not be construed as a relinquishment of our Committee's claim to jurisdiction on matters of this nature. We would also expect to have Members of our Committee named as Members of the Conference Committee on the legislation (on any matters within our jurisdiction).

Lastly, I would request inclusion of our exchange of correspondence on this matter in the Record during House consideration of H.R. 2121, and in any report by the Committee on Public Works and Transportation on H.R. 2121.

Sincerely,

JACK BROOKS, Chairman.

H.Rep. 103–359, at pp. 16–17.